## POFFENBARGER *v.* OLSON.

PATENTS; INTERFERENCE; EVIDENCE.

1. Where the claims of an interference relating to paper bottles or liquid containers call for the stitching of the walls of the paper receptacle prior to the application of paraffin, and for two or more parallel and vertical lines of stitching, an exhibit of one of the parties was *held* to respond to the issue, although it had not been paraffined, and contained but one row of stitching, as it was well known that such paper receptacles must be paraffined to render them impervious to water, and, given the idea of stitching, the double row became mere mechanical development.

2. While the fact that the testimony of a witness for one of the parties to an interference would have merely been cumulative, will not alone be a sufficient reason for not calling him, the fact that he is the attorney for the party is sufficient, as counsel who would knowingly elicit false testimony would not be likely to hesitate to add his own testimony to that of a witness who had already testified.

3. A decision of the Commissioner of Patents awarding priority to the junior party as to certain claims of an interference, involving a paper bottle or liquid container, was *reversed,* upon a review of the evidence, upon the ground that it failed to show that the junior party had sustained the burden of proof that was upon him, although the testimony on behalf of the senior party was not as clear and convincing as it might have been.

No. 757. Patent Appeals. Submitted March 14, 1912. Decided April 1, 1912.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference case. *Reversed.*

The facts are stated in the opinion.

*Mr. James L. Hopkins* for the appellant.

*Messrs. Small & Small* for the appellee.

Mr. Justice Robb delivered the opinion of the Court:

This is an interference proceeding in which the Examiner of Interferences awarded priority of invention as to two of the three counts to Emil S. Olson, and as to the third count to William L. Poffenbarger. The Examiners in Chief awarded priority as to all three counts to Poffenbarger, while the Commissioner reversed that decision as to the first and second counts, and awarded priority as to those counts to Olson.

The invention relates to a paper bottle or liquid container, and differs from the prior art in that the walls of the receptacle are secured by stitching prior to the application of paraffin, and in the further detail that the top is folded upon itself to form a closure.

Count 3 differs from the other counts in that it calls for two or more parallel and vertical lines of stitching at the meeting edges of the body sheet of the paper, while the other counts are silent as to the number of rows of stitching. Count 3 also calls for a sealing means extended through the folded closure. It is difficult to perceive wherein there is any patentable distinction between this count and the other two. We here reproduce counts 1 and 3:

"1. As a new article of manufacture, a paper bottle whose side walls are formed of a single blank cut to form a truncated cone, the meeting edges of said blank being overlapped and stitched together, said bottle having a circular bottom member fitted in the larger end of the bottle and provided with a down turned annular marginal flange which is secured to said side walls by stitching, the bottles so constructed being treated to make the paper impervious to moisture and the seams watertight."

"3. In a paper container, the combination of a conoidal body formed from a single sheet of paper whose meeting edges are secured by two or more parallel and vertical lines of stitching; a bottom member secured in place at the lower end of the body member by means of one or more lines of stitching; the mouth of the body member being folded over upon itself to form a flat

closure and sealing devices extending through said closure, substantially as described."

Poffenbarger is the senior party, having filed his application on October 5, 1908. He alleged reduction to practice about January of the same year. The Olson application was filed April 12, 1909. In his preliminary statement he alleged conception and disclosure January 7, 1908, drawings January 20th, and reduction to practice March 17th of the same year.

At the time the invention was made, Poffenbarger was president of the Sanitary Paper Milk Bottle Company, located at St. Louis, Missouri, the stock of which Olson was then endeavoring to sell. Prior to Poffenbarger's connection with the company, he had been connected with a wood finishing company and also with a varnish company, and had become interested in various types of liquid containers. He testifies that sometime in November or December of 1907 he conceived the invention, and that on the 29th of December of that year he made a model, which he has introduced as his Exhibit No. 1. This exhibit is hand sewed, and responds to the issue, except that it has not been paraffined, and contains but one row of stitches. As it was then well understood that such paper receptacles must be paraffined to render them impervious to liquid, the model discloses all that was new. We attach no importance to the lack of more than one vertical row of stitching. Given the idea of stitching, the double row became a mere mechanical development. This model, Poffenbarger says he exhibited to his wife and stepson, Charles C. Aldrich, both of whom testify that they saw it. He also says that on New Year's Eve of 1907 he took the model to the Jai Alai Skating Rink for the purpose of showing it to a Mr. Dingelstedt, who was president of the corporation operating the rink and who subsequently became interested in the Pyraform Bottle Manufacturing Company of St. Louis, organized to exploit the invention. It was for the purpose of interesting him in the invention that Poffenbarger interviewed him. Mr. Dingelstedt in enabled to fix the date when this model was shown him by reason of the fact that he was in a hurry to leave the rink to go downtown to see the old year

out and the new year in.   He fixes the time of the interview
as sometime between 8.30 and 11 o'clock in the evening.   He
positively identifies the model as the one shown him at the time.
His testimony is reasonable, and not easily explained away.
Some attempt has been made by Olson to show that Poffen-
barger reached the home of a Mrs. Marsh in St. Louis about
8.30 of the same evening, and hence, it is argued, he could not
have been at the rink at the precise time indicated in Dingel-
stedt's testimony.   Poffenbarger, in his cross-examination,
Dingelstedt already having testified, was asked whether the
interview occurred between 8.30 and 11 o'clock, and replied:
"Yes, sir; *in the early part of the evening."*   Olson's rebuttal
testimony falls short of establishing, with any degree of definite-
ness, just when the Poffenbargers did reach Mrs. Marsh's home,
and, in our view, the testimony concerning the interview at the
rink is not at all discredited.   The party which Mrs. Marsh
was giving was a "watch party," the refreshments not being
served until 12 o'clock.   There was no especial reason, there-
fore, why the guests should arrive at an early hour, and no rea-
son whatever for remembering two years after the event just
when they did arrive.

Poffenbarger further testifies that on the first Sunday in
January, 1908, he showed this same model, Exhibit No. 1, to
his attorney, Mr. Hopkins, and that it was to this invention
that Mr. Hopkins referred in a letter written from Washington
February 14th, which letter is in evidence.   This particular
testimony is attacked on the ground that Mr. Hopkins should
have testified, the contention being that his failure in this re-
gard indicates that his testimony would have been unfavorable
had he been called as a witness.   The testimony of Dingelstedt
stood uncontradicted, and hence the testimony of Mr. Hopkins
would have been cumulative.   While this reason alone would
not have been sufficient to excuse the failure to call him as a
witness, the additional fact that he was representing Poffenbarg-
er in the taking of testimony does.   It may be suggested that
counsel who would knowingly elicit false testimony would not
be likely to hestitate to add his own testimony to that of his

witness. Poffenbarger having introduced evidence tending to show priority of conception, it was open to counsel for Olson to call Mr. Hopkins in contradiction of Poffenbarger, if they so desired.

Poffenbarger also insists that early in January of 1908 he showed his model bottle to Olson. Without further reviewing Poffenbarger's evidence, we will now turn briefly to that of Olson. In reviewing that evidence it must be remembered that Olson is the junior party. The opinion of the Commissioner fails to give due weight to this fact. Olson states that he first thought of the invention about January 7, 1908; that he mentioned his idea to a Mr. Murphy, an official of the Sanitary Company, who, according to Olson, expressed the opinion that he was crazy. Evidently not desiring this opinion to become general, Olson, as he says, decided to keep quiet and work out the idea by himself. Later on he changed his mind, however, and disclosed the idea to a Mr. Fizzell, who made a sketch which is in evidence. Sometime in 1909 Fizzell dated the sketch as of "January, '08." Mr. Fizzell in his testimony, which was entirely from memory, fixed the date of this drawing as sometime in January. Olson further testifies that about the 23d or the 24th of February he met a Mr. McKee of the Singer Sewing Machine Company, who asked the witness how they, the Sanitary Company, were doing; that witness informed him that Mr. Murphy was in Abington, Illinois, trying to make a machine that would glue the paper cones for a style of bottle then being exploited. Witness further says that McKee then asked, why we did not sew the bottle, and that witness told him he had thought of that sometime ago and had told Mr. Murphy about it, but did not have the proper machinery to do it with. Whereupon Mr. McKee suggested that if he, the witness, would get the paper, he, Mr. McKee, would sew a bottle so that it could be tested; that as the result of this talk Mr. McKee did sew a bottle which, after being paraffined, was found to be impervious to liquid; that as a result Poffenbarger telephoned Murphy to return, and informed Murphy, in effect, that Olson had devised a sewed bottle which was a great success. Murphy,

who when he testified had become very hostile to Poffenbarger, and whose testimony is so evidently biased as to render it of little value, corroborates Olson. A Mr. Emig, whose interests are antagonistic to Poffenbarger, but who is evidently fair in his testimony, remembers overhearing a telephonic conversation between Poffenbarger and Murphy in which Murphy was informed that "Mr. Olson has found a way to sew the bottle *with a sewing machine.*" That is probably what Poffenbarger did say over the telephone, and is not inconsistent with his claim to being the originator of the idea of sewing the bottle. While he evidently did not know that already there were sewing machines which could do such stitching, he probably did know that the invention amounted to nothing unless it could be practised by the use of a machine.

The testimony of Mr. McKee, although he was called by Olson, is in many material respects contradictory of and inconsistent with the statements of Olson. It will be remembered that Olson testified that about March 17th he saw Mr. McKee and, in the course of the conversation that ensued, informed him that he, Olson, had previously thought of stitching the bottles. Mr. McKee testified that Olson showed him one of the glued bottles about February, 1908, and that the first conversation he had with Olson concerning the stitching process was about April 1st. The witness further testified that he then suggested to Olson "that it would be a good idea to sew the bottle on a sewing machine;" that this suggestion did not make a very favorable impression upon Olson; that previous to this occasion no reference had been made to sewing bottles. The witness further testified that upon his suggestion Olson brought him some paper suitable for making a bottle, and he, McKee, found a sewing machine that would make the two rows of stitching, one at a time. A two-needle machine of the cylinder type was subsequently obtained from the factory by Mr. McKee for the work. Witness continued: "After the bottle was finished, it was taken down to the office of the Sanitary Bottle Manufacturing Company by myself and given to Mr. Poffenbarger, whom I had previously met, understanding that he was

the prime mover in the business." Mr. McKee further testified that subsequently two machines for experimental purposes were installed for the Sanitary Company, and that this was done as the result of an interview with Poffenbarger and Olson. Olson had testified that the machines were set up for him personally. It is in evidence that Poffenbarger subsequently suggested to Mr. McKee that he apply for the patent. This suggestion, however, may have been the result of a conception on the part of Poffenbarger that the real novelty of the discovery resided in the utilization of machinery.

We are far from convinced that Olson has sustained the burden of proof in this case. The testimony in behalf of Poffenbarger, while not as clear and convincing as it might have been, leaves little room for doubt that whatever knowledge Olson had of the invention prior to McKee's suggestion as to the use of sewing machines in practising it he gained from Poffenbarger.

The decision must be reversed.                    *Reversed.*